753 A.2d 556

**Kendrick Orlando CHARITY**

v.

**STATE of Maryland.**

**No. 1949, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

June 8, 2000.

William P. Robinson, Jr. (Robinson and Anderson, on the brief), Norfolk, VA, for appellant.

Kathryn Grill Graeff, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, Baltimore and David R. Ruark, State's Attorney for Wicomico County, Salisbury, on the brief), for appellee.

Argued before MOYLAN, WENNER and BYRNES, JJ.

MOYLAN, Judge.

If there is a lesson to be learned from this case, it is that when the police are permitted a very broad but persistently controversial investigative prerogative,[1] they would be well advised, even when not literally required to do so, to exercise that prerogative with restraint and moderation, lest they lose it. In *Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), the Supreme Court extended law enforcement officers a sweeping prerogative, permitting them to exploit the investigative opportunities presented to them by observing traffic infractions even when their primary, subjective intention is to look for narcotics violations.

The so-called *"Whren* stop" is a powerful law enforcement weapon. In utilizing it, however, officers should be careful not to attempt to "push out the envelope" too far,[2] for if the

---

1. *See Whitehead v. State,* 116 Md.App. 497, 500, 698 A.2d 1115 (1997). *See also* David A. Harris, *Whren v. United States: Pretextual Traffic Stops and "Driving While Black,"* The Champion, March 1997, at 41.

2. Instead of appreciating that with the *"Whren* stop" the law enforcement prerogative may already be stretched to its outermost limit, police

perception should ever arise that "*Whren* stops" are being regularly and immoderately abused, courts may be sorely tempted to withdraw the weapon from the law enforcement arsenal. Even the most ardent champions of vigorous law enforcement, therefore, would urge the police not to risk "killing the goose that lays the golden egg."

The secondary lesson is that if this case is not squarely controlled by a linear application of the holding of the Court of Appeals in *Ferris v. State*, 355 Md. 356, 735 A.2d 491 (1999), it is nonetheless a variation on a theme by *Ferris*.

The appellant, Kendrick Orlando Charity, was convicted in the Circuit Court for Wicomico County of the possession of cocaine with the intent to distribute. His sole contention on appeal is that the trial court erred in denying his motion to suppress.

### The Traffic Stop and Its Sequelae

At about 7:10 P.M. on the evening of January 21, 1999, Maryland State Police Sergeant Mike Lewis observed three vehicles traveling closely together, southbound, on Route 13 in Wicomico County near Salisbury. Sergeant Lewis, though assigned primarily to drug interdiction, believed that the second and third vehicles were following too closely to the respective vehicles in front of them for the foggy and rainy weather conditions. He called for assistance and then initiated a traffic stop of the second and third vehicles. Sergeant Lewis approached the second car, a blue Nissan Maxima driven by the appellant, while another trooper approached the third vehicle. The Nissan Maxima had North Carolina tags. The driver of the third car was given a written warning and released within several minutes. The appellant was not.

According to Sergeant Lewis's testimony at the suppression hearing, he approached the second vehicle, advised the appellant as to why he had been stopped, and asked to see a

officers fall into the habit of accepting the "*Whren* stop" as an unremarkable norm and then try to stretch yet further what may already be right at the breaking point.

driver's license and registration card. After noticing that Sean White, the only passenger in the car, was not wearing a seat belt, Sergeant Lewis requested his identification as well. Both the appellant and White complied. As he stood at the window, Sergeant Lewis noticed a large bundle of air fresheners hanging from the rear view mirror. A subsequent count revealed 72 such air fresheners.

Sergeant Lewis also indicated at the suppression hearing that "there was little doubt" in his mind that there was "something criminal going on inside the vehicle." His suspicion was based on the large number of air fresheners and on the fact that the appellant had a North Carolina driver's license and White had a New York license. Based on those observations, Sergeant Lewis asked the appellant to step out and to move to the rear of the vehicle, notwithstanding that a light rain was falling. He then began questioning the appellant as to where he was coming from and where he was going.

Leaving the appellant standing in the rain, Sergeant Lewis then approached the passenger side of the vehicle and began asking White the same questions. After receiving answers from White that were different from the answers given by the appellant, Sergeant Lewis returned to the rear of the vehicle where the appellant was standing. Because it then began to "rain heavier" and because he wanted to have the appellant "seated in [his] cruiser," Sergeant Lewis requested a "consensual patdown" of the appellant. The appellant ostensibly consented.

In the course of the pat-down, Sergeant Lewis felt a bulge in the appellant's front pants pocket. In response to the sergeant's question regarding the contents of the pocket, the appellant reached into the pocket and pulled out a packet of gum and some money. In the process of the appellant's doing so, Sergeant Lewis saw "a one gram size packet" of what he "readily recognized to be marijuana" between the appellant's ring finger and his middle finger. Sergeant Lewis then "plucked" the packet from the appellant's fingers, held it in

front of his face, and stated, "This authorizes me to conduct a full-blown search of your vehicle now."

White was also ordered out of the vehicle and was directed to stand next to the appellant while Lewis and another state trooper, Corporal Bromwell, performed a *Carroll* Doctrine search of the vehicle. A large quantity of cocaine, 194 grams, was found in the bottom of a box located inside the trunk. Both the appellant and White were then placed under arrest and subsequently charged with 1) the importation of cocaine, 2) possession of cocaine with intent to distribute, 3) possession of cocaine, 4) conspiracy to import cocaine, and 5) conspiracy to possess cocaine with the intent to distribute.

## The Suppression Hearing

The appellant filed a motion to suppress the cocaine. A hearing was held on August 10, 1999. With respect to the traffic stop, the judge stated:

> I certainly have no question under the evidence as to propriety of the stop. It was a dark, rainy, foggy night with cars following much too closely for the conditions that existed there.

> The officer stopped the two cars that were in violation of the law, in his opinion, for following too closely. After he stops the car, Trooper Lewis approaches the defendant's vehicle.

The judge went on to make other rulings with respect to 1) the propriety of a further *Terry*-stop, 2) the voluntariness of a consent to a pat-down, and 3) probable cause for a *Carroll* Doctrine search of the car. At the conclusion of the hearing, he denied the appellant's motion to suppress.

## The Trial

The appellant agreed to proceed on a plea of Not Guilty on an Agreed Statement of Facts on the charge of the possession of cocaine with intent to distribute. He was found guilty of

that offense.[3] The State placed the remaining four charges against him on the stet docket. The appellant then noted this appeal.

## The Limited Focus of Our Review

Because the only contention raised by the appellant is that the trial judge erroneously denied his motion to suppress the cocaine found in the trunk of the car, the only subject matter properly before us consists of the motion to suppress, the transcript of the hearing on the motion, and the trial judge's ruling on the motion. Except for the fact that the appellant was convicted, without which we would have no appeal, it is for our purposes as if the trial on the merits never took place.

The leading summary of what is properly before a reviewing court on an issue concerning pretrial suppression was made by Judge Karwacki in *In re Tariq A–R–Y,* 347 Md. 484, 488, 701 A.2d 691 (1997):

> In reviewing the denial of a motion to suppress, we look only to the record of the suppression hearing and do not consider the evidence admitted at trial. *Gamble v. State,* 318 Md. 120, 125, 567 A.2d 95, 98 (1989); *Herod v. State,* 311 Md. 288, 290, 534 A.2d 362, 363 (1987); *Trusty v. State,* 308 Md. 658, 670, 521 A.2d 749, 755 (1987).

Even within that limited universe of the suppression hearing, we are yet further restricted in that we may consider only

---

**3.** The appellant's passenger and codefendant, Sean White, was tried by a Wicomico County jury and found guilty on five related counts. He received a sentence of twenty-five years.

The diametrically different fates of this appellant and his codefendant turned on the fact that the codefendant did not enjoy Fourth Amendment standing. The suppression hearing was concerned only with the cocaine found in the *Carroll* Doctrine search of the trunk of the appellant's automobile. The codefendant conceded that he had no standing in the automobile. Indeed, his trial strategy seemed to be to distance himself as much as possible from any arguable interest in the appellant's automobile. His defense, at trial and on appeal, was focused almost exclusively on challenging the legal sufficiency of the evidence to connect him with the cocaine found in the trunk of the automobile.

that version of the evidence most favorable to the prevailing party. Judge Karwacki explained:

We are further limited to considering only that evidence and the inferences therefrom that are most favorable to the prevailing party on the motion, in this instance the State. *Riddick v. State*, 319 Md. 180, 183, 571 A.2d 1239, 1240 (1990); *see also Simpler v. State*, 318 Md. 311, 312, 568 A.2d 22, 22 (1990).

*Id.* At the suppression hearing in this case, for instance, the appellant himself testified, diametrically contrary to the testimony of Sergeant Lewis, 1) that he was not closely following any other automobile but was many car lengths behind the nearest vehicle and 2) that he was never asked to consent to a frisk of his person and never did consent. For present purposes, however, we treat that testimony as if it had never been given. Our ruling will be based exclusively on the State's most favorable version of the events.

■ The one obvious qualification to or modification of a reviewing court's acceptance of the version of the evidence most favorable to the prevailing party, of course, is with respect to findings of first-level fact actually made by the hearing judge. Except in rare cases of clear error, we give great deference to such findings of fact when actually made. The actual findings of fact made by the hearing judge, unless clearly erroneous, "trump" the version most favorable to the prevailing party to the extent to which they might be in conflict. Again, Judge Karwacki explained:

In considering the evidence presented at the suppression hearing, we extend great deference to the fact-finding of the suppression hearing judge with respect to determining the credibility of witnesses and to weighing and determining first-level facts. *Riddick*, 319 Md. at 183, 571 A.2d at 1240. When conflicting evidence is presented, we accept the facts as found by the hearing judge unless it is shown that those findings were clearly erroneous.

347 Md. at 488–89, 701 A.2d 691. In this case there was no divergence between the State's best version of the facts and the facts as found by the hearing judge.

█ As to what then to make of those first-level fact findings, however, that is ultimately the *de novo* responsibility of the reviewing court. In this regard, Judge Karwacki observed:

> As to the ultimate conclusion of whether a search was valid, we must make our own independent constitutional appraisal by applying the law to the facts of the case.

347 Md. at 489, 701 A.2d 691. *See also Ferris v. State*, 355 Md. at 368–69, 735 A.2d 491 ("[W]e view the legal conclusions *de novo.*")

In *Ornelas v. United States*, 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), the Supreme Court contrasted the great deference a reviewing court should extend to a hearing judge's assessments of credibility and "determination[s] of historic facts," 517 U.S. at 696, 116 S.Ct. 1657, with the obligation of a reviewing court to make its own independent or *de novo* judgment with respect to ultimate, conclusory, or "mixed question[s] of law and fact." *Id.* Chief Justice Rehnquist, 517 U.S. at 697, 116 S.Ct. 1657, wrote for an eight-to-one majority:

> We think independent appellate review of these ultimate determinations of reasonable suspicion and probable cause is consistent with the position we have taken in past cases. We have never, when reviewing a probable-cause or reasonable-suspicion determination ourselves, expressly deferred to the trial court's determination. A policy of sweeping deference would permit, "[i]n the absence of any significant difference in the facts," "the Fourth Amendment's incidence [to] tur[n] on whether different trial judges draw general conclusions that the facts are sufficient or insufficient to constitute probable cause." Such varied results would be inconsistent with the idea of a unitary system of law.

(Citations omitted). The Supreme Court, 517 U.S. at 699, 116 S.Ct. 1657, concluded:

We ... hold that as a general matter determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal.

In parsing how an appellate court reviews a hearing judge's findings on a mixed question of law and fact, we ourselves observed in *Walker v. State,* 12 Md.App. 684, 695, 280 A.2d 260 (1971):

> What we mean, therefore, when we say that we have the obligation to make an independent, reflective constitutional judgment on the facts whenever a claim of a constitutionally-protected right is involved is that, although we give great weight to the findings of the hearing judge as to specific, first-level facts (such as the time that an interrogation began, whether a meal was or was not served, whether a telephone call was requested, etc.) we must make our own independent judgment as to what to make of those facts; we must, in making that independent judgment, resolve for ourselves the ultimate, second-level fact—the existence or non-existence of voluntariness.

At least two such ultimate, conclusory, or mixed questions of law and fact are before us for our independent assessment in this case. One of them concerns the voluntariness of the appellant's ostensible consent to the pat-down of his person and the reasonableness of Sergeant Lewis's perception as to that consent. The other is whether the proper scope of a *"Whren* stop" was exceeded so as to have necessitated an independent Fourth Amendment justification for the roadside proceedings that followed.

With respect to our assessment of the voluntariness of the appellant's ostensible consent to the pat-down, *Perkins v. State,* 83 Md.App. 341, 346, 574 A.2d 356 (1990), clearly set out the appropriate standard of review:

> *As we are called upon to review the constitutionality of an allegedly consensual search, our standard of review is clear.* We extend great deference to the fact finding of the suppression hearing judge with respect to determining the credibilities of contradicting witnesses and to weighing and

determining first-level facts. *With respect to the ultimate, conclusionary fact of whether the act of consent was truly voluntary,* however, *we are called upon to make our own independent, reflective constitutional judgment.*

(Emphasis supplied). *See also Gamble v. State,* 318 Md. 120, 128, 567 A.2d 95 (1989); *Matthews v. State,* 89 Md.App. 488, 497, 598 A.2d 813 (1991).

With respect to the second question, *Munafo v. State,* 105 Md.App. 662, 672, 660 A.2d 1068 (1995), was emphatic that the determination of whether there was one detention or two is not a finding of fact with respect to which the appellate court will give deference to the hearing judge but is, instead, a conclusory or constitutional fact with respect to which the reviewing court must make its own independent, *de novo* determination:

> Whether appellant was effectively stopped twice for constitutional purposes is not a question of fact, but one of constitutional analysis. Accordingly, the trial court's conclusion in that regard is not entitled to deference.

*See also Whitehead v. State,* 116 Md.App. 497, 505–06, 698 A.2d 1115 (1997).

## The *"Whren* Stop"

■ The initial stop of the appellant's automobile for a traffic infraction was completely legitimate. Sergeant Lewis testified that while traveling at approximately 65 miles per hour, the appellant's automobile, in rainy and foggy conditions at night, was following the car in front of it by no more than one to one-and-a-half car lengths. The hearing judge found as a fact that the appellant was "following too closely" and that the stop for the traffic infraction was fully justified. We accept that as historic fact.

To be sure, Sergeant Lewis was not a highway patrolman with any apparent interest in enforcing the traffic regulations *per se.* He was a 15–year veteran of the Maryland State Police assigned to the special task of drug interdiction. He had made between 400 and 600 arrests on the Eastern Shore

of Maryland in cases "involving controlled dangerous substances being transported into or through the State of Maryland." He recounted at length his extensive training in drug interdiction at special schools and courses in Florida, Canada, Illinois, Nevada, Detroit, New Jersey, West Virginia, Virginia, and North Carolina. There is every reason to believe that when he saw the appellant's car traveling as one of what appeared to be three cars "in convoy" southbound on a major drug corridor from New York to Norfolk and points south, he suspected the appellant to be a drug courier. The fortuitous traffic infraction simply gave him the opportunity to pursue his primary investigative mission.

All of that is beside the point, however, because *Whren v. United States* permits a narcotics officer to seize the opportunity presented by a traffic infraction to make a stop that would not otherwise be permitted. The narcotics officer need not apologize for this. The *"Whren* stop" is part of the arsenal. There are, however, scope limitations on what may be done pursuant to a permissible *"Whren* stop" or pursuant to any traffic stop.

█ A person engaged in criminal activity compromises **to some extent** his constitutional expectations of privacy whenever he is careless enough to commit a traffic infraction while simultaneously committing a crime.[4] That is the essential effect of *Whren.* In the statement we just made, however, the critical qualifying words are the adverbial phrase **"to some extent."** *Whren* is primarily a justification for the initial police intrusion. There are, however, two key Fourth Amendment considerations: 1) the justification for the initial intrusion into a protected privacy interest and 2) the scope of what may be done even following a legitimate initial intrusion. *Coolidge v. New Hampshire,* 403 U.S. 443, 467, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Our concern in this case is not with the *"Whren* stop" *ab initio.* It is with the scope limitations

---

4. It is a truism that when engaged in crime, one should not attract attention to oneself.

that necessarily attach to a traffic stop generally and to a *"Whren* stop" specifically.

In *Whitehead v. State,* 116 Md.App. at 506, 698 A.2d 1115, Judge Sonner pointed out that although the Supreme Court has placed its imprimatur on a *"Whren* stop" generally, it has not yet fleshed out the permissible contours of such a tactic:

> *Whren* ... did not provide guidance as to just how far the police may go in detaining and interrogating someone who has been stopped on the pretext of the enforcement of the traffic laws.

### Scope Limitations of a Traffic Stop:
### The *Ferris v. State* Sequence

■ *Ferris v. State,* 355 Md. 356, 735 A.2d 491 (1999), squarely establishes one such scope limitation. Once the purpose of a traffic stop has been fully and finally served, the traffic stop may not supply the Fourth Amendment justification for any further intrusion that follows.

*Ferris* did not involve a *"Whren* stop." From the outset, it was a genuine traffic stop and nothing else. Maryland State Trooper Andrew Smith was posted on Interstate 70 in Washington County to look for speeding infractions; he was operating a laser speed gun. The posted speed limit was 65 miles per hour at the spot where he clocked Ferris's vehicle traveling at a speed of 92 miles per hour.

Trooper Smith activated his emergency lights and stopped Ferris's automobile without incident. On demand, Ferris produced his driver's license and registration card. Ferris remained behind the wheel of his own vehicle as Trooper Smith returned to his patrol car and checked for outstanding warrants. Trooper Smith wrote out a speeding citation. He returned to Ferris's vehicle and presented Ferris with the citation. Ferris signed the citation and Trooper Smith returned Ferris's driver's license and registration card to him, along with a copy of the citation. At that point, the purpose of the traffic stop had been fully and finally served.

While that traffic-oriented stop was in progress, however, Trooper Smith and another trooper had made observations that raised their suspicions about other criminal activity on the part of Ferris and his passenger. Ferris was asked if he would mind alighting from his car, stepping to the back of the vehicle, and answering questions. The questioning of both suspects ultimately led to the search of the automobile in which they had been riding and to the recovery of a quantity of marijuana.

In determining the extent to which a law enforcement officer who has properly stopped a motor vehicle based on probable cause may detain and question the driver after the officer has concluded the purpose for the initial stop, the Court of Appeals in *Ferris* explained, 355 Md. at 369, 735 A.2d 491:

> The Fourth Amendment protects against unreasonable searches and seizures, including seizures that involve only a brief detention. The Supreme Court has made clear that *a traffic stop involving a motorist is a detention which implicates the Fourth Amendment.* It is equally clear, however, that ordinarily such a stop does not initially violate the federal Constitution if the police have probable cause to believe that the driver has committed a traffic violation. Nonetheless, the Supreme Court has also made it clear that *the detention of the person "must be temporary and last no longer than is necessary to effectuate the purpose of the stop."*

(Citations omitted; emphasis supplied).

> Writing for the Court, Judge Raker further explained that: [t]he officer's purpose in an ordinary traffic stop is to enforce the laws of the roadway, and ordinarily to investigate the manner of driving with the intent to issue a citation or warning. *Once the purpose of that stop has been fulfilled, the continued detention of the car and the occupants amounts to a second detention.* Thus, *once the underlying basis for the initial traffic stop has concluded, a police-driver encounter which implicates the Fourth Amendment*

*is constitutionally permissible only if either (1) the driver consents to the continuing intrusion or (2) the officer has, at a minimum, a reasonable, articulable suspicion that criminal activity is afoot.*

355 Md. at 372, 735 A.2d 491 (emphasis supplied). *See also Snow v. State,* 84 Md.App. 243, 248–68, 578 A.2d 816 (1990).

In *Ferris,* there was a clearly demarcated sequence. At the moment when Trooper Smith returned Ferris's driver's license and registration card to him and handed Ferris a copy of the speeding citation, the initial traffic stop came to an end. It could no longer serve as the Fourth Amendment justification for anything that followed. The Court of Appeals did then go on to hold that because of the coercive atmosphere attendant on the traffic stop and with no clear dissipation of that atmosphere, the confrontation between the troopers and the passengers that followed the stop were not voluntary acts on the part of the passengers. There was, rather, a second Fourth Amendment detention of the passengers requiring an independent justification. The Court of Appeals concluded that there was no independent justification for that second detention.

·It is on the difference in the sequencing between this case and *Ferris* that the State here relies. The State argues that this case is "not controlled" by *Ferris* because *Ferris* was concerned with a second detention after the termination of the initial traffic-oriented first detention, whereas this case is not. In its brief, the State points out that

> [t]*he initial distinguishing factor between Ferris and the instant case is that the initial traffic stop here had not concluded before the drugs were found.* Unlike in Ferris, Charity had not been issued a warning or citation at any time prior to the discovery of the marijuana. *Lewis testified that he issued Charity a warning, not [at the] roadside but during processing at the station later that night.* And this was not a situation, as in *Pryor v. State,* involving a "detention that extended beyond the period of time that it would reasonably have taken for a uniformed officer to go

through the procedure involved in issuing a citation to a motorist." *Lewis testified that the average time it took to issue a warrant or citation was five minutes, and he found the marijuana approximately two to three minutes after he stopped Charity's car ... Thus, this case is not controlled by Ferris because there was no second stop requiring reasonable suspicion.*

At the surface level, we agree with the State. In *Ferris,* there was a clear sequence: 1) an initial detention as a result of a traffic infraction, 2) a precisely pinpointed termination of the initial detention, and 3) the beginning of a second and independent detention. In the case now before us, there was not such a neat sequence. According to the State's argument, the first detention was not formally terminated until hours later and then only at the station house miles away. In that sense, to be sure, this case is not controlled by the literal holding of *Ferris.* That is not, however, the end of the analysis. Although the first traffic-oriented detention was not formally terminated until long after all of the critical investigative events in this case had occurred, this does not mean that *Ferris* has no bearing on this case. Albeit not a case vulnerable to a literal or linear application of the *Ferris* holding, this case is clearly a variation on a theme by *Ferris.*

## Other Scope Limitations on a Traffic Stop: An Unreasonable Prolongation

■ Just as a traffic stop, be it a *"Whren* stop" or be it subjectively genuine, loses its energizing power to legitimate a contemporaneous but extrinsic investigation once it is formally terminated, *Ferris v. State,* so too may the legitimating *raison d'etre* evaporate if its pursuit is unreasonably attenuated or allowed to lapse into a state of suspended animation. We are not suggesting for a moment that when the police effectuate a traffic stop, they are operating under a "time gun" or may not pursue two purposes essentially simultaneously, with each pursuit necessarily slowing down the other to some modest extent. We are simply saying that the purpose of the justify-

ing traffic stop may not be conveniently or cynically forgotten and not taken up again until after an intervening narcotics investigation has been completed or has run a substantial course. The legitimating power of a traffic stop to justify a coincidental investigation has a finite "shelf life," even when the traffic stop, as in this case, is not formally terminated.

The moment of termination of the initial justification in a *Ferris* sequence is easy to pinpoint. When, as here, however, the initial justification simply dissipates or evaporates away through neglect, pinpointing the moment that it loses its efficacy becomes more problematic. Informal or functional terminations are, by their nature, more elusive than formal ones, but they are just as terminal. In *Whitehead v. State,* 116 Md.App. at 506, 698 A.2d 1115, we did not hesitate to hold that an unduly protracted detention was unconstitutional notwithstanding our difficulty in pinpointing the precise moment at which it lapsed into unconstitutionality:

> *Exactly when he began the prohibited detention is not completely ascertainable.* At the very latest, however, it began when he learned that he had no reason to detain Whitehead further because he learned there was no reason to do so from the radio report from his barrack. On the record presented, *we find no justification for his abandoning the requirement of proceeding with the issuing of the traffic citation and beginning the outer search of the car with the K–9.*

(Emphasis supplied).

The State would like to have us set some arbitrary, minimal time period that would have to expire before the traffic-oriented justification could be held to have lapsed. Even if in a given case there were no semblance of processing or pursuing the traffic violation, the State would still like the benefit of a "time-out" for so long as it would normally and reasonably take to process a routine traffic stop.

The State here argues, for instance, that because Sergeant Lewis did not return the appellant's driver's license and registration card or actually "complete" the traffic stop by

issuing a citation or warning, Sergeant Lewis remained free to conduct any inquiry he chose without any further justification so long as he did so within the time it normally would take for a traffic stop to be completed. If we agreed with that contention, we would be giving police officers free rein during the first five minutes, for instance, of any valid traffic stop. Such a result flies in the face of the spirit, if not the letter, of *Ferris*, not to mention the Fourth Amendment. A clever officer could always ward off the foreclosing effect of *Ferris* by deliberately delaying his final termination of the traffic stop. Such a tactic would render *Ferris* a dead letter by vitiating any need for an independent justification for a second stop simply by delaying the termination of the first stop.

With respect to the tactical inefficacy of such a calculated delay in issuing a traffic warning, Judge Davis's observation in *Munafo v. State*, 105 Md.App. at 672, 660 A.2d 1068, is pertinent:

> The distinguishing fact in the present case is that *Deputy Houck did not actually issue a citation or warning after receiving word that Munafo's license and rental agreement were valid.* Rather, he waited for Sergeant Elliott to arrive on the scene before approaching appellant a second time. Even then it is unclear whether Deputy Houck intended to issue a citation when he approached the vehicle a second time. *We find it more than slightly illogical to allow officers to circumvent Snow [or Ferris]* [5] *merely by wait-*

---

**5.** ' *Snow v. State*, 84 Md.App. 243, 578 A.2d 816 (1990), was a case in which this Court actually anticipated the decision of the Court of Appeals in *Ferris v. State*. In *Munafo*, 105 Md.App. at 670, 660 A.2d 1068, we summarized the import of *Snow:*

> In *Snow*, we concluded that the purpose of a traffic stop is to issue a citation or warning. Once that purpose has been satisfied, the continued detention of a vehicle and its occupant(s) constitutes a second stop, and must be independently justified by reasonable suspicion.

> In *Snow*, as in *Ferris*, there was a discernible sequence, with a formal termination of the first detention followed by the initiation of the second detention. In *Munafo*, as in this case, the line between the two was blurred.

*ing to issue a citation until after conducting a search of a detained vehicle.*

(Emphasis supplied).

■ In determining whether a police officer has exceeded the temporal scope of a lawful traffic stop, the focus will not be on the length of time an average traffic stop should ordinarily take nor will it be exclusively on a determination, pursuant to *Ferris,* of whether a traffic stop was literally "completed" by the return of documents or the issuance of a citation. Even a very lengthy detention may be completely reasonable under certain circumstances. Conversely, even a very brief detention may be unreasonable under other circumstances. There is no set formula for measuring in the abstract what should be the reasonable duration of a traffic stop. We must assess the reasonableness of each detention on a case-by-case basis and not by the running of the clock.

In both *Snow v. State, supra* and *Munafo v. State, supra,* we held that an initially valid traffic stop could not serve as the justifying predicate for the narcotics-related investigation that followed in its immediate wake, notwithstanding the fact that in both cases "the total length of the stop was brief and did not exceed the normal duration for a traffic stop." *Munafo,* 105 Md.App. at 671, 660 A.2d 1068.

What might be a reasonable duration for most traffic stops might not be reasonable duration for a particular traffic stop on a particular occasion. Reasonableness may depend on whether the purpose of the traffic stop is actually being pursued with some modicum of diligence. We repeat that in processing a traffic infraction the police are not to be monitored with a stop-watch. Neither, however, does *Whren* confer on them, for example, five minutes of "free time" to do whatever they wish in the service of some other investigative purpose.

## The Prolongation of the Traffic Stop
## In this Case

Under the extreme circumstances of this case, which are what prompted our observations at the very outset of this opinion, it is clear to us, on our independent assessment of the ultimate Fourth Amendment merits, that the police purpose of taking appropriate action against the appellant for his traffic infraction of following too closely effectively lapsed into a coma at the instant Sergeant Lewis approached the Nissan Maxima and the appellant rolled down the window.

As soon as Sergeant Lewis smelled and saw the air fresheners, if not before, he was, figuratively as well as literally, "on the scent" of a narcotics violation. His total focus had shifted from the traffic infraction, if it had ever been there, to drug interdiction.

Q: Now, when you engaged Mr. Charity in some conversation there at roadside, *your initial purpose was to tell him that he was driving too close* or following—

A: That's correct. Yes, sir.

\* \* \*

Q: Now, when you got to Mr. Charity's driver's window, *tell me the reason you didn't just give him the summons right there or at least a warning right there?*

A: Well, as I knelt down, sir, and asked for his license and registration, he gave me his license, the registration was retrieved, I believe from the glove box, and *as I stood next to the car I was overcome with the odor of air fresheners emanating from the vehicle's interior, and when I knelt down, I could clearly see a large bunch of air fresheners hanging from the rear view mirror which ended up being 72 separate pine tree air fresheners hanging from the rear view mirror. Most I have ever seen in my career.*

Q: So there were a lot of air fresheners in there?

A: Yes, sir.

Q: Still, is that a violation of the law?

A: No, sir, but *it is a common indicator of drug traffick-ing. That in isolation means nothing, but I was considering that in aggregate.*

Q: *You were considering that?*

A: *That's correct.*

Q: *Did you tell him at that time that he was following the vehicle too closely?*

A: *Yes, and he apologized for following too closely.* I have that documented in my report.

Q: He apologized for following too closely?

A: Yes, sir.

Q: *Did you issue him the warning then?*

A: *No, I did not.*

(Emphasis supplied).

█ The next action Sergeant Lewis took after confronting the appellant as he sat behind the steering wheel was to order him out of the car and to the rear of the vehicle for further questioning. The State hastens to point out that under *Pennsylvania v. Mimms,* 434 U.S. 106, 108–12, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) and *Maryland v. Wilson,* 519 U.S. 408, 411–12, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997), the police enjoy the automatic prerogative, following a lawful traffic stop, of ordering the driver out of the car. The State is correct that the entitlement to order the driver out of the car is an automatic incident of a traffic stop. In this case, however, Sergeant Lewis's ordering of the appellant out of the car was not, even in part, **an incident of the traffic stop.** It was, in our judgment, exclusively for the independent purpose of investigating a likely narcotics violation.

Initially, it is clear that Sergeant Lewis's ordering of the appellant out of the car so that he might be subjected to further questioning at the rear of the car had no conceivable relationship to the purpose of the traffic stop. The traffic

infraction was that of "following too closely," a violation as relatively minimal as traffic infractions can be. For that infraction, the appellant was only issued a warning, a typical sanction for following too closely. Once Sergeant Lewis, while still standing outside the driver's window, informed the appellant that he had been stopped for following too closely and the appellant had both acknowledged and apologized for the infraction, there was nothing further to be done. There was no reason the warning, or even a citation, could not have followed forthwith. There was, moreover, no traffic-related reason for any further questioning.

As a practical matter, the entire subject of the traffic infraction never came up again until the warning was ultimately issued hours later at the station house. If we focused only on the traffic infraction, it is inconceivable that one could be stopped on the roadside at 7:10 P.M. for following too closely and held for hours before being issued a warning later that night and miles away. It is hard even to fathom a purpose for giving the warning at that late time and remote place except to establish a neat terminal point for the processing of the traffic infraction, for purposes of *Ferris v. State,* so that the traffic stop might better serve as the "cover" for the detention involved in conducting the narcotics investigation.[6]

Contrasting the handling of the appellant's traffic violation with the handling of the same violation by the driver of the other car that was stopped is not, of course, controlling; it is nonetheless instructive as to what the police were actually doing in the case of the appellant. Sergeant Lewis and Corporal Bromwell were traveling together in the same unmarked police cruiser. The appellant's car and the car behind it were traveling at precisely the same speed on precisely the same road under precisely the same weather conditions and were each following the car in front at essentially the same

---

**6.** Because the appellant was at that time already under arrest for and facing probable substantial jail time for a series of narcotics-related felonies, warning him not to "follow too closely" in the future seems bizarre. A more appropriate warning might have been to avoid the Route 13 "corridor."

distance. Both cars were stopped and Corporal Bromwell approached the other car just as Sergeant Lewis approached the appellant's car.

The driver of the other car was issued a warning and sent on his way within no more than a minute or two. The appellant was not. The driver of the other car was never asked to alight from it and to step to its rear, notwithstanding *Pennsylvania v. Mimms* and *Maryland v. Wilson*. The appellant was. With regard to the respective traffic infractions *per se*, there was nothing to distinguish the case of the other driver from that of the appellant. In assessing the selective ordering of the appellant out of the car, moreover, it is not without significance that it was raining and, indeed, beginning to rain heavily. That is a harsh and inclement venue for the issuing of a traffic warning.

Just as it is clear that a traffic-related purpose was no longer being served even marginally, it is equally clear that, measured from the moment Sergeant Lewis ordered the appellant out of the car, a narcotics-related purpose had not simply been opportunistically added to the traffic-related purpose but had, indeed, preempted the field as the exclusive purpose for every investigative action that followed. Before Sergeant Lewis ordered the appellant out of the car, he had smelled and seen the air fresheners. He had noted that the car had a North Carolina license tag and that it was traveling southbound on Route 13, a well known "drug corridor" between New York City and the upper South. He had noted that the appellant had a North Carolina driver's license and that his passenger had a Virginia identification card and a New York driver's license. He had noted that the appellant avoided all eye contact with him:

As I talked to the two men, there was little doubt in my mind based on the overwhelming [odor] of air freshener coming from the vehicle. I had a vehicle stopped on U.S. Route 13 with a driver from Charlotte, North Carolina. I had a passenger in a vehicle with a Virginia identification card. I had total eye contact that was lost between myself and the driver. He avoided all eye contact with me, and

when I talked to the two gentlemen and listened to their responses, *there was little doubt in my mind that [there] was something criminal going on inside the vehicle.*

(Emphasis supplied).

When asked on direct examination what his purpose was in ordering the appellant out of the car, Sergeant Lewis's answer indicated an exclusively narcotics-related purpose:

Q: What was your purpose in asking him to step out of the vehicle?

A: I wanted to talk to him at the rear of the vehicle. I noticed the overwhelming odor of air freshener emanating from the vehicle's interior, and again, there were 72 air fresheners hanging from the rear view mirror which was excessive in my opinion. In fact, it was a very large bundle hanging up there together. I later counted 72 air fresheners.

The purpose for talking to the appellant at the rear of the vehicle, notwithstanding the rain, was clear. Sergeant Lewis wanted to talk to him out of the presence of the passenger, just as he subsequently wanted to talk to the passenger out of the presence of the appellant. The questioning of both would concern where they had been, how long they had been there, and where they were going. The object of such separate interrogations is to look for inconsistencies in the respective stories.

It is equally obvious that the questions of "whence they cometh and whither they goeth" had no remote bearing on the traffic infraction of following too closely. Judge Sonner's observation about attempting to justify this investigative technique—probing for inconsistent stories—as a routine incident of a normal traffic stop goes to the raw central nerve of what we are called upon to assess in this case:

He did not set about to issue a citation or warning but, instead, from the beginning, actively sought to determine whether, in his mind, there were sufficient circumstances and facts that would then allow him to proceed to search for narcotics, the primary law enforcement task for which he

was using the traffic laws. We observe from the record that *part of his activity was to engage the two occupants of the automobile in conversation about the details of their journey to determine whether they were consistent.*

116 Md.App. at 503, 698 A.2d 1115 (emphasis supplied). *Whitehead*'s further observation, 116 Md.App. at 504, 698 A.2d 1115, reflects our feeling here that such questioning has nothing to do with serving the purpose of the traffic stop:

> *In asking the questions, Trooper Donovan was not making inquiry to further the enforcement of the 55 mile speed limit.* He was looking for justification to intrude upon the privacy of the person whom he had detained.

(Emphasis supplied).

On cross-examination by defense counsel, Sergeant Lewis was questioned as to his reason for ordering the appellant out of the car. He reiterated his belief that "something [criminal] could certainly be going on [inside the car]."

Q: All right. Now, what happens?

A: Well, *the driver avoided all eye contact with me.*

Q. All right. Is there a requirement that somebody look at you when they talk to you?

A: No, sir. It's [not a] requirement.

Q: All right. *So what significance is that?*

A. Well, based on my experience, there is significance to that.

Q: All right.

A: *Someone who is involved in criminal deception, it's very difficult to look a police officer in the eyes when you are standing next to the vehicle in a uniform. That coupled with guilt will produce a fear-induced adrenaline rush, and they find it very difficult to look a uniformed police officer in the eye.*

Q: Are you going to tell me that every traffic stop you take every driver that looks you in the eyes he is innocent of any criminal activity?

A: No, sir. I'm not going to tell you that.

Q: Then what is your next point? What happened next?

A: *Based on my experience,* sir—

Q: On your experience, he didn't look at you—

A: *—and other indicators that I already mentioned, I believe something could certainly be going on.*

(Emphasis supplied).

After detailing his narcotics-related suspicions, Sergeant Lewis forthrightly acknowledged that his intention in ordering the appellant out of the car was "to confirm [those] suspicions" and to develop, if possible, the probable cause necessary to "justify a possible search of the vehicle."

It was my intent at that point to confirm my suspicions.

Q: In order to justify a search of this car?

A: Justify a possible search of the vehicle, yes, sir.

The resemblance of *Munafo v. State,* 105 Md.App. 662, 660 A.2d 1068 (1995), to the case before us is eerie, right down to the fact of a Nissan Maxima being stopped in Wicomico County. In *Munafo,* as here, the stop was for a routine traffic infraction, in that case exceeding the posted speed limit by nineteen miles per hour. In that case, the deputy sheriff not only took from the driver, as here, a license and rental agreement (in this case a registration card) but further checked them out. In that case, as here, the deputy "did not immediately issue a ticket or warning for the ... offense." 105 Md.App. at 667, 660 A.2d 1068. In that case, as here, the deputy, at the very outset of the traffic stop, "formulated a hunch that appellant had drugs in the car." *Id.*

The deputy summoned a second officer to the scene, who arrived within two to three minutes. The two officers then "conferred for one to one-and-a-half minutes at the rear of appellant's car." While the deputy sheriff talked to the appellant at the driver's window, the other officer, from the other side of the car, shined his flashlight into the car and spotted a suspicious clear plastic "baggie" containing a suspicious "dark-colored substance." As the defendant there lifted up his arm,

the second officer spotted suspected marijuana in plain view inside an open bag. The defendant was ultimately convicted of the possession with intent to distribute narcotic drugs.

In that case, as in this, the defendant argued that the traffic-related detention had effectively come to an end and that a second narcotics-related detention, without an adequate justification, had actually begun:

> Although he concedes that the traffic stop effected by Deputy Houck was legal, appellant maintains that there were actually two stops that evening: (1) the initial traffic stop; and (2) a second stop which occurred immediately thereafter. *Appellant argues that Deputy Houck was required to issue a ticket or a warning promptly after receiving the results of the license and registration check. In appellant's view, the continued detention of his vehicle after that point was not justified* by a reasonable suspicion and was, therefore, illegal.

105 Md.App. at 669–70, 660 A.2d 1068 (emphasis supplied).

The deputy "could not remember whether he wrote the [traffic] warning before [the second officer] arrived or after appellant was arrested." 105 Md.App. at 667, 660 A.2d 1068. Nor could he "recall whether he returned the documents to appellant" before the other officer, with flashlight, made his visual scan of the interior of the car. 105 Md.App. at 668, 660 A.2d 1068. In any event, "[a]pproximately ten minutes had passed from the initial stop of appellant's car to the moment of his arrest." *Id.*

The State in *Munafo* argued strenuously that a ten-minute stop was reasonable and that the average traffic stop would routinely last that long. The trial judge agreed with the State:

> Deputy Houck testified that the stop at issue here lasted approximately ten minutes and that an average traffic stop lasts ten to fifteen minutes. Based on this testimony, the

trial judge attempted to distinguish the present case from *Snow*, on the ground that "a long wait" was not involved. 105 Md.App. at 672, 660 A.2d 1068.

This Court rejected the State's argument and reversed the ruling of the trial judge. We held that an officer in a case such as this is "required to end the stop promptly and send appellant on his way." We held that even a brief delay may be "entirely unjustified" if it does not serve "the purpose of the original stop." As Judge Davis explained, 105 Md.App. at 673, 660 A.2d 1068:

> In the present case, the original traffic stop was justified solely by appellant's speeding and reckless driving. *Once Deputy Houck learned that appellant's license and registration were in order, he was required to end the stop promptly and send appellant on his way.* Instead, he waited two to three minutes for Sergeant Elliott to arrive, and spent an additional minute or two discussing the situation with Sergeant Elliott before the two officers approached the car together. Deputy Houck testified that he did not remember returning appellant's license, that he did not remember giving appellant a ticket or warning, and that he did not tell appellant that he was free to leave. Instead, Deputy Houck engaged appellant in conversation while Sergeant Elliott scanned the car with a flashlight. *Although the delay was brief, it was entirely unjustified by the purpose of the original stop.*

(Emphasis supplied).

*Pryor v. State*, 122 Md.App. 671, 716 A.2d 338 (1998), involved a classic *"Whren* stop." A detective, investigating narcotics violations, received word from a confidential informant that Pryor was storing cocaine "in a secret compartment within the dash of [his] automobile." 122 Md.App. at 675, 716 A.2d 338. The detective waited until Pryor left his apartment by car and then followed in an unmarked vehicle. When, at one point, he observed Pryor driving at a speed of 45 miles per hour in a 25 miles per hour zone, he seized the opportunity to stop Pryor's car. Pryor and his passengers were ordered

out of the car and forced to await the arrival of a K–9 "drug dog" approximately twenty minutes later. Chief Judge Murphy, 122 Md.App. at 674–75, 716 A.2d 338, stated the constitutional limitations on a *"Whren* stop" squarely:

> This appeal . . . requires that we examine an important rule of engagement applicable to the forcible stop of a motorist who commits a minor traffic violation while under police surveillance: the point in time at which continued detention violates the motorist's Fourth Amendment protection against unreasonable searches and seizures. We hold that, unless continued detention can be justified by what occurs during the brief period of time it takes to determine whether the motorist has a valid license and whether the vehicle has been reported stolen, *a motorist who is subjected to a "Whren stop" for a minor traffic violation cannot be detained at the scene of the stop longer than it takes—or reasonably should take—to issue a citation for the traffic violation that the motorist committed.*

(Footnote omitted; emphasis supplied).

In *Pryor,* we held that in addition to a permissible traffic stop, there was articulable suspicion for a *Terry*-stop as well. We further held, however, that neither of those initial stops— the *"Whren* stop" or the *Terry*-stop—could justify holding Pryor for a period of twenty to twenty-five minutes pending the arrival of the drug-sniffing canine. Chief Judge Murphy reasoned:

> The Fourth Amendment permits the forcible stop of a motorist who is observed by a law enforcement officer to be violating a "rule of the road." The Fourth Amendment also permits the forcible stop of a vehicle when there is reasonable articulable suspicion to believe that its occupants are involved in criminal activity. *In neither of these situations, however, may the occupants of the vehicle be detained for an extended period of time.* In the absence of a justification for continued detention that manifests itself during the period of time reasonable necessary for the officer to (1) investigate the driver's sobriety and license status, (2) establish that the vehicle has not been reported stolen, and (3)

issue a traffic citation, the Fourth Amendment prohibits a detention in excess of that period of time. In this case, *whether the period of appellant's detention is characterized as a "first" (traffic) stop followed by a "second" (drug investigation) stop or as a single stop that was justifiable for two different reasons, appellant was detained much longer than was reasonable.*

122 Md.App. at 682, 716 A.2d 338 (emphasis supplied).

For present purposes, *Pryor* concluded that a *"Whren* stop" cannot "justif[y] a detention that extend[s] beyond the period of time that it would reasonably have taken a uniformed officer to go through the procedure involved in issuing a citation to a motorist." *Id.*

*Whitehead v. State,* 116 Md.App. 497, 698 A.2d 1115 (1997), also involved a *"Whren* stop." Whitehead was stopped for driving at a speed of 72 miles per hour in a 55 miles per hour zone, southbound, on Interstate 95. The officer who stopped him was assigned to patrol Interstate 95 for "the enforcement of the controlled dangerous substance laws." After stopping Whitehead and learning that his driving and registration documents were in order, the officer further detained Whitehead pending the arrival of a K-9 dog. We held that even though the traffic stop had not been formally terminated, there was nonetheless a scope violation of what is permitted under a *"Whren* stop":

After receiving information that Whitehead's papers were in order, that he was not wanted on any outstanding warrants, and that the car was not stolen, *Trooper Donovan was under a duty expeditiously to complete the process of either issuing a warning or a traffic citation for whatever traffic offenses that he had observed.*

116 Md.App. at 503, 698 A.2d 1115 (emphasis supplied).

Judge Sonner's conclusion for this Court in *Whitehead* is dispositive of our conclusion in the case now before us:

The detention in *Whren* that the Supreme Court approved was brief, and the arrest for violation of the narcotics laws instantaneously followed the stop. We think it would be a

mistake to read *Whren* as allowing law enforcement officers to detain on the pretext of issuing a traffic citation or warning, *and then deliberately to engage in activities not related to the enforcement of the traffic code in order to determine whether there are sufficient indicia of some illegal activity. Stopping a car for speeding does not confer the right to abandon or never begin to take action related to the traffic laws and, instead, to attempt to secure a waiver of Fourth Amendment rights* from a citizen whose only offense to that point is to have been selected from among many who have been detected violating a traffic regulation. An interpretation of *Whren* that is consistent with *Snow* and *Munafo requires the police to issue the citation or warning efficiently and expeditiously with a minimum of intrusion, only that which is required to carry forth the legitimate, although pretextual, purpose for the stop.* We are condemning not the stop itself, but the detention after the pretextual stop that was for the purpose of determining whether the trooper could acquire sufficient probable cause or a waiver that would permit him to search the car for illegal narcotics.

(Emphasis supplied).

█ We hold that once 1) Sergeant Lewis advised the appellant that he had been stopped for following too closely, 2) the appellant acknowledged his infraction and apologized for it, and 3) Sergeant Lewis had examined the appellant's driver's license and registration card, any further detention of the appellant to engage in a narcotics-related investigation was beyond the scope of what is permitted as part of a *"Whren* stop."

### Articulable Suspicion
### For a Narcotics–Related *Terry*-stop

The State's argument that the physical evidence was properly not suppressed is in the alternative. On the one hand, the State maintains that everything done up to and including the recovery of the cocaine from the trunk of the automobile

was done under the covering aegis of the traffic-related "*Whren* stop." The State argues that *Ferris* does not apply because the traffic-related stop had not come to an end until the traffic warning was ultimately issued to the appellant by Sergeant Lewis hours later at the station house. We have rejected that argument.

The State argues in the alternative that even if an independent Fourth Amendment justification for the detention were required, articulable suspicion for a narcotics-related *Terry*-stop had accrued prior to the search of the trunk or even prior to the pat-down of the appellant. Indeed, the hearing judge, after finding that there had been a proper traffic stop for following too closely, went on to make the following findings and ruling with respect to articulable suspicion of a possible narcotics violation:

> After he stops the car, Trooper Lewis approaches the defendant's vehicle.
>
> Immediately, he smells the odor of air fresheners. He observes a very large quantity of air fresheners in the vehicle, something that in his past experience has been used to conceal the odor of controlled dangerous substances.
>
> He talks to the defendant. He talks to the [passenger]. He gets different stories as to origin and destination. There is a toll receipt that conflicts with the stories that both the passenger and driver gave him as to when the vehicle left the state, the other side of the Bridge Tunnel and when it went on its trip either to New Jersey or New York depending on which of the parties stories you believe.
>
> He observes the behavior of two parties which, coupled with the other, absent anything else, the behavior could signify just nervousness at being stopped, however, that coupled with the air fresheners, the different stories, etc., *the Court is of the opinion there was a reasonable articulable suspicion to conduct a further inquiry to see if there had been a violation of the laws.*

(Emphasis supplied).

That ruling based on that collection of facts has now been rendered immaterial by our holding as to when the permissi-

ble detention pursuant to the traffic-related stop had come to an end. The story as to "whence and whither" told to Sergeant Lewis by the appellant came after the appellant had been ordered out of the car and into the rain. The inconsistent story told by Sean White came after that. The fact of inconsistency between the two stories and the further inconsistencies between each story and the earlier observed receipt from the Chesapeake Bay Bridge–Tunnel were all post-*Whren* phenomena. Most of the notice taken by Sergeant Lewis of the appellant's nervousness occurred when the appellant was standing outside the car. Sergeant Lewis's notice of the failure of Sean White to make eye contact with him was also post-*Whren.*

As we "log in" each new blip to appear on the radar screen, it clearly becomes pointless even to consider the hypothetical question of whether the combination of circumstances recited by the trial judge would add up to articulable suspicion.[7] As of the critical moment an independent Fourth Amendment justification was needed to legitimate either the appellant's second detention or his unreasonably protracted first detention, most of those blips had not yet appeared.

 We hold that as of the critical moment he stood at the driver's window of the Nissan Maxima, Sergeant Lewis may have had a strong hunch but he did not yet have *Terry*-level articulable suspicion that drug-related activity was afoot. A

---

7. If such a question were before us, however, we might find instructive the observation of *Munafo v. State*, 105 Md.App. at 674, 660 A.2d 1068, with respect to a very similar set of circumstances in *Snow v. State:*

In *Snow*, the trooper who detained Snow articulated four reasons underlying his suspicion that Snow was carrying drugs: (1) Snow seemed nervous and avoided making eye contact; (2) Snow was travelling from Philadelphia to Washington, D.C., a route commonly used to transport drugs; (3) three air fresheners hung from the rearview mirror of Snow's vehicle; and (4) Snow did not consent to a search. Under the totality of the circumstances, *we concluded, the trooper did not have a reasonable suspicion that Snow was engaged in criminal activity other than speeding, and could not detain Snow after a ticket had been issued.*

(Citation omitted; emphasis supplied).

*Terry*-stop to investigate for drugs, therefore, was not justified.

## The Search for the Holy Grail:
## What Is the Issue That Ultimately Matters?

So an unconstitutional detention of the appellant occurred. So what? Why do we care? What significance, if any, does that unconstitutional detention have for the only issue before us in this case. It is so easy at times for all hands to get excited about the rightness or wrongness of police behavior that everyone loses sight of the ultimate issue.

There is a single contention raised by the appellant on this appeal. As he himself phrases it, "THE SEARCH OF THE APPELLANT'S VEHICLE WAS VIOLATIVE OF THE FOURTH AND FOURTEENTH AMENDMENTS." Everything argued by the appellant, both in brief and orally before this Court, points exclusively toward the ultimate conclusion at the end of his brief that "the search of the vehicle and the evidence recovered therefrom should have been excluded by the trial court." The single thing sought to be suppressed, the exclusive object of the suppression hearing, was the cocaine found in the trunk of the appellant's automobile.

The marijuana found on the appellant's person was not the object of the suppression motion nor the subject of the suppression hearing. Neither were compromising admissions made nor nervous behavior exhibited during a period of unconstitutional detention. Those things, of course, could have been the objects of a suppression hearing and could, therefore, have become appellate issues, but they were not in this case. The only investigative action with which we are ultimately and directly concerned is the *Carroll* Doctrine search of the trunk of the appellant's automobile.

If somehow probable cause had existed for the search of the appellant's car, untainted by the antecedent unconstitutional detention, that unconstitutional detention would have no significance on this appeal. In terms of familiar constitutional

algebra, the probable cause would have proceeded from an independent source. Everything else in this case takes on significance only to the limited extent that it bears on the ultimate issue of the *Carroll* Doctrine search of the appellant's automobile.

As we turn our focus onto the probable cause for the automobile search, it is immediately clear that the critical constituent element thereof was the small amount of marijuana found on the person of the appellant as a result of an ostensibly consensual pat-down. It is unnecessary for us to consider whether the marijuana found on the person of the driver, coupled with other suspicious circumstances, added up to probable cause to believe that other drugs would be found in the car. The appellant makes no argument in that regard. Everyone in this case operated on the assumption that if the marijuana were in the equation, probable cause would result. The converse is all we need consider. If the marijuana, because tainted, were not part of the equation, probable cause would not result.

### The Voluntariness of
### The Consent to the Pat–Down

As our focus now turns to the pat-down that produced the marijuana, we may confine our inquiry to a single legitimating rationale. The State has never sought to argue that the pat-down was supportable as a *Terry*-frisk. Indeed, Sergeant Lewis never testified that he had any reason to fear a weapon or that he undertook to frisk the appellant for his own protection. The only rationale ever put forward by the State was that the appellant had voluntarily consented to the pat-down. The ruling of the suppression hearing judge was that a consensual pat-down occurred:

> He asks the driver to get out of the car. I believe the patdown was consensual, and I believe from the conflicting testimony, I believe the testimony of the officer that the defendant did pull the bulge out of his pocket at which time the officer observed the marijuana and only after that he

sees the marijuana, and at that point, based on the other factors, I believe there was probable cause for the search of the vehicle.

Whether consent to the pat-down was voluntary is a question that ordinarily would be resolved by looking to the totality of the circumstances. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). If the consent were sought and given during a period of unconstitutional detention, however, that factor alone, absent attenuation between the initial taint and the presumptively poisoned fruit, would be dispositive that the consent was not voluntary. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

■■■ We have held that the appellant was being unconstitutionally detained at the time Sergeant Lewis asked him to consent to a pat-down. That unconstitutional detention began ,when he was asked to get out of his vehicle in the rain and move to its rear. It continued as he was questioned by Sergeant Lewis as to where he had been and where he was going. It continued as Sergeant Lewis left him standing in the rain and went off to question the passenger as to where he had been and where he was going. It continued as Sergeant Lewis returned and sought the appellant's consent to the pat-down as a necessary precondition for the appellant to be allowed to get out of the rain and to sit in the police cruiser. There was no attenuation between the tainted detention and the ostensible consent. The consent was the "fruit of the poisoned tree."

Even if we had made no formal ruling with respect to the unconstitutional detention of the appellant, however, our independent conclusion with respect to the involuntariness of the ostensible consent would be the same. Even according to Sergeant Lewis's own testimony, he never expressly asked the appellant for permission. He simply expressed his desire to conduct a pat-down. The appellant, in turn, never expressly gave permission. He simply held out his arms in what may have been nothing more than an act of acquiescence:

A: I said, sir, *I would like to pat you down for any weapons.* You don't have any guns on you or anything, do you?

He said, no, sir. And *he held his arms out to his side* just like I am doing right now.

(Emphasis supplied).

The explanation advanced by Sergeant Lewis as to why he needed to conduct a pat-down of the appellant strikes us as patently disingenuous. The appellant had been standing in the rain for some minutes. As Sergeant Lewis reapproached him after talking to Sean White, it began to rain even more heavily. Sergeant Lewis stated that he wanted to permit the appellant to get out of the rain. Why the police car? Why not permit the appellant to get out of the rain by getting back in his own car? It was no longer necessary to keep the appellant and his passenger apart so that their respective stories could be checked for inconsistencies. That had already been done. Bizarrely, after the pat-down revealed that the appellant was unarmed (but also revealed the marijuana), the appellant was required to continue standing in the heavy rain while the officers conducted the *Carroll* Doctrine search of the trunk of his automobile. The concern for his comfort was palpably thin.

Even accepting that the police car was the only feasible shelter from the rain, however, it was advanced as if axiomatic that one would routinely have to submit to a frisk for weapons to be permitted to enter a police car. One wonders why. There was no one in the police car whom the appellant could have shot or otherwise injured. If the appellant, possibly armed, would have posed a danger while seated in the police car, why did he not pose a similar danger when earlier seated in his own car? Why did he not pose a similar danger when standing at the rear of his car and face-to-face with Sergeant Lewis or when standing there unattended as Sergeant Lewis went to talk to the passenger? Why would the appellant, if armed, have posed a greater danger in the police car than he posed anywhere else? The unchallenged myth, moreover, that

one must undergo some special ritual cleansing or mikvah before being permitted to enter the *sanctum sanctorum* of a police cruiser is laughable.

In any event, the appellant had been standing in the rain for several minutes. On January 21 it was presumably a cold rain. As the rain suddenly got heavier, the appellant was led to believe that he would be permitted to get out of the rain and sit in the police cruiser only if he consented to a pat-down of his person. That circumstance tilts strongly against the voluntariness of the ostensible consent that followed.

*Ferris v. State* decided an issue, of course, other than the voluntariness of a consent to a search. *Ferris*'s observations, however, about the coercive effect that certain police actions had on the stopped motorist in the doctrinal context of that case provide instructive guidance as to the coercive effect that similar police actions may have had on the appellant in the doctrinal context of this case.

The fact that the initial traffic-related *"Whren* stop" was legal does not mean that it could not have contributed to the coercive atmosphere of ensuing events, such as the request to consent to a pat-down in this case. Judge Raker observed in this regard, 355 Md. at 378, 735 A.2d 491:

> *First and foremost is the prior existence of the initial traffic seizure of Ferris. This pre-existing seizure enhanced the coercive nature of the situation* and the efficacy of the other factors in pointing toward the restriction of Ferris's liberty. The situation faced by Ferris was markedly different from that of a person passing by or approached by law enforcement officers on the street, in a public place, or inside the terminal of a common carrier.

(Footnote omitted; emphasis supplied).

Although *Ferris* was analyzing the voluntariness of an ostensible consent to exiting a car and then submitting to questioning, its analysis is pertinent to the voluntariness of the ostensible consent to a pat-down in this case. Not being informed of the right to refuse the request is a factor that may be considered.

[T]he [Supreme] Court [in *Ohio v. Robinette*, 519 U.S. 33, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996)] reiterated that " 'knowledge of the right to refuse consent is one factor to be taken into account' " in determining the voluntariness, and thus constitutional validity of a defendant's purported consent. Consequently, an officer's failure to advise a motorist that he or she could refuse . . . remains a factor to be considered. As Justice Stewart's opinion for the majority in [*United States v. ]Mendenhall[*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)] recognized:

> [I]t is especially significant that [Mendenhall] was twice expressly told that she was free to decline to consent to the search, and only thereafter explicitly consented to it. Although the Constitution does not require proof of knowledge of a right to refuse as the *sine qua non* of an effective consent to a search, *such knowledge was highly relevant to the determination that there had been consent.* And, perhaps more important for present purposes, the fact that the officers themselves informed [Mendenhall] that she was free to withhold her consent substantially lessened the probability that their conduct could reasonably have appeared to her to be coercive.

355 Md. at 380, 735 A.2d 491 (citations omitted; emphasis in original).

In no way did Sergeant Lewis's asking of the appellant to get out of the car for additional questioning further the purpose of giving the appellant a traffic warning for following too closely. In *Ferris* it was not even raining but a similar request there to get out of the car and move to its rear provoked the following observation by the Court of Appeals, 355 Md. at 382–83, 735 A.2d 491:

> *Trooper Smith affirmatively sought to move Ferris from the relative comfort of his vehicle to a more coercive atmosphere between the Camry and the two patrol cars.... The record does not support a finding that any legitimate law enforcement purpose which justified the initial detention was furthered by the removal of Ferris from his automobile. See [Florida v.] Royer,* 460 U.S. [491] at 505, 103 S.Ct.

[1319] at 1328[, 75 L.Ed.2d 229 (1983)] ("The record does not reflect any facts which would support a finding that the legitimate law enforcement purposes which justified the detention in the first instance were furthered by removing Royer to the police room prior to the officer's attempt to gain his consent to a search of his luggage.").

(Citations omitted; emphasis supplied).

Another factor was a common denominator both in *Ferris* and in this case:

[T]he presence of two uniformed law enforcement officers increased the coerciveness of the encounter.

355 Md. at 383, 735 A.2d 491. With respect to another common denominator factor, the *Ferris* opinion stated:

Finally, we note the geographic and temporal environment of the encounter: late at night on the side of a presumably desolate, rural interstate highway. *The time and location of the encounter would have been unsettling to a reasonable person in Ferris's position.* Consequently, *the physical environment of the encounter* between Trooper Smith and Ferris *heightened the coerciveness of the encounter.*

*Id.* (Emphasis supplied). In *Ferris,* to be sure, the hour was later than in this case. The countervailing factors in this case, however, were the rain and the fog.

The cluster of coercive factors impacting on Ferris closely resemble the cluster of coercive factors impacting on the appellant in this case:

We find significant the following circumstances: the trooper never told Ferris he was free to leave, the trooper's "request" of Ferris to exit the vehicle seamlessly followed the pre-existing lawful detention, the trooper removed Ferris from his automobile, the trooper separated Ferris from the passenger, there were two uniformed law enforcement officers present, the police cruiser emergency flashers re-

mained operative throughout the entire encounter, and it was 1:30 a.m. on a dark, rural interstate highway.

335 Md. at 378–79, 643 A.2d 906.

■ As an additional and independent reason for reversing the appellant's conviction, we hold that, completely aside from the "fruit of the poisoned tree" effect of the appellant's unconstitutional detention, the ostensible consent he gave to Sergeant Lewis's request that he submit to a pat-down was involuntary. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The totality of circumstances was so clearly involuntary that we further hold that it would have been unreasonable for Sergeant Lewis to have concluded otherwise. *Illinois v. Rodriguez,* 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990); *Florida v. Jimeno,* 500 U.S. 248, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991).

The air fresheners, although they may have created a hunch, did not create an articulable suspicion. The marijuana produced by the appellant after Sergeant Lewis, in the course of the pat-down, felt a bulge in the appellant's pants and asked about it, was tainted. As a result, the probable cause for the *Carroll* Doctrine search of the appellant's automobile was tainted. The cocaine found in the course of that automobile search should have been suppressed.

\* \* \*

After invoking the investigative prerogative of a *"Whren* stop" in this case, the police pushed it beyond its limits.

*JUDGMENT REVERSED; COSTS TO BE PAID BY WICOMICO COUNTY.*