IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| NAIFECE HOUSTON, | § | |
| | § | No. 12, 2020 |
| Defendant Below, | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | ID No. 1901017650(N) |
| STATE OF DELAWARE, | § | |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted: February 3, 2021
Decided: April 20, 2021

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices, constituting the Court *en Banc.*

Upon appeal from the Superior Court. **AFFIRMED.**

Benjamin S. Gifford, IV, Esquire, THE LAW OFFICE OF BENJAMIN S. GIFFORD, IV, Wilmington, Delaware, *for Appellant Naifece Houston.*

Andrew J. Vella, Esquire, DELAWARE DEPARTMENT OF JUSTICE, Wilmington, Delaware, *for Appellee State of Delaware.*

**TRAYNOR**, Justice:

The defendant, who was charged with drug offenses following a traffic stop, moved to suppress evidence on various grounds, including that the arresting officers impermissibly extended the stop to allow time for a drug-sniffing dog to arrive. In his motion to suppress, the defendant asked the Superior Court to hold a *Daubert*[1] hearing so that he could contest the admissibility of testimony from one of the arresting officers that he could detect an odor at the scene emanating from the defendant's car—a "chemically smell" that the officer associated with large amounts of cocaine. Because the officer's testimony was based on his training and experience as a police officer, according to the defendant, it was "expert in nature,"[2] triggering the trial court's gatekeeping function under *Daubert* and its progeny.

The Superior Court disagreed, concluding that the officer's testimony was not based on scientific, technical, or other specialized knowledge, but, rather, was lay opinion testimony admissible under Delaware Rule of Evidence 701. This, the defendant submits, was legal error in the absence of which his motion to suppress would have been granted. And had the defendant's motion been granted, the State would have been left with no evidence that he was guilty of the drug offenses with

---

[1] *Daubert v. Merrill Dow Pharm. Inc.*, 509 U.S. 579 (1993); *see Rodriguez v. State*, 30 A.3d 764, 768–69 (Del. 2011); *M.G. Bancorporation, Inc. v. Le Beau*, 737 A.2d 513, 521–22 (Del. 1999).
[2] Opening Br. at 21.

2

which he was charged; he therefore asks us to reverse his convictions of those offenses.

In this opinion, we conclude that both the defendant and the State—and ultimately the Superior Court—mistakenly framed the issue in the proceedings below as hinging upon the admissibility of the officer's testimony under the rules of evidence governing opinion testimony. It has long been the case that, at a suppression hearing, a trial court may rely on evidence that would not be admissible at trial. This is so because "the rules of evidence normally applicable to criminal trials do not operate with full force at hearings before the judge to determine the admissibility of evidence."[3] Thus, the true question before the Superior Court was whether the challenged testimony was sufficiently reliable to justify the officer's suspicion that there was cocaine in the defendant's car. And the Superior Court's answer to that question is committed to its sound discretion. For the reasons that follow, we conclude that the court's admission of the officer's testimony was not an abuse of discretion. Thus, we affirm.

## I.

As midnight approached on a January evening in 2019, Detective Matthew Radcliffe and Corporal Eric Saccomanno of the Delaware State Police were traveling behind a Chevrolet Malibu with a Florida registration on Memorial Drive

---

[3] *United States v. Matlock*, 415 U.S. 164, 172–73 (1974); *see also* D.R.E. 104.

near its intersection with New Castle Avenue in New Castle County. Though both officers are members of the Governor's Task Force—a unit according to Detective Radcliffe, that "monitor[s] probationers, high crime areas, drug activities[,] and violent offenders"[4]—Corporal Saccomanno later reported that, on that evening, the officers were "conducting traffic enforcement."[5] Both officers observed the Malibu crossing the white fog line on the right side of the road several times. Detective Radcliffe described the Malibu's path as "drift[ing] into the shoulder portion then back on the roadway numerous times."[6] Concerned that the Malibu's driver might be intoxicated in what Corporal Saccomanno described as a "high pedestrian traffic area,"[7] the officers pulled the Malibu over and, as they did, notified a nearby K9 officer with a "narcotic trained K9 dog,"[8] of the impending stop.

After the Malibu stopped, both officers approached its passenger side from the rear. There was but one person in the Malibu—Naifece Houston, the driver. Detective Radcliffe stood behind Corporal Saccomanno, who had engaged with Houston, and observed that Houston appeared to be out of sorts. In Detective Radcliffe's words:

> He was extremely nervous to the point where I could see him trying to control his breathing with his chest going up and down. And his hands

---

[4] App. to Opening Br. A66.
[5] Adult Complaint and Warrant, Ex. B ¶ 1, *State v. Houston*, Justice of the Peace Court No. 11, Case No. 19-01-017650 (Jan. 29, 2019).
[6] App. to Opening Br. at A67.
[7] Adult Complaint and Warrant, *supra* note 5, at Ex. B ¶ 2.
[8] App. to Opening Br. at A155.

were sort of shaking to the point where he was fumbling with the credentials, . . . license and the other documents with the car stop.[9]

Houston's behavior, which included "looking around [as if for] an avenue of escape"[10] caused Detective Radcliffe concern that Houston "could possibly take off with the vehicle at that time."[11]

When Corporal Saccomanno obtained Houston's credentials and returned to the patrol car to run Houston's information through the National Crime Information Center database—Houston was carrying a Pennsylvania driver's license—Detective Radcliffe remained at the vehicle and talked to Houston. When Radcliffe asked Houston whether he had been drinking and why he was so nervous, Houston responded that he had not been drinking and was just tired. After this discussion, Radcliffe returned to his patrol car, while keeping an eye on Houston, to check Saccomanno's progress with Houston's information. At that time, the database inquiry was still being processed.

While back at the patrol car, Radcliffe witnessed Houston peering back at the officers through his rearview mirror while also examining the gear selector and steering wheel. This, coupled with Houston's general state of nervousness, led Radcliffe to fear Houston might flee the scene. Consequently, Radcliffe returned to

---

[9] *Id*. at A60.
[10] *Id*.
[11] *Id*.

5

the driver side of the vehicle with the intention of removing Houston from the vehicle to prevent a potentially dangerous vehicle-flight situation. In the suppression hearing testimony at the heart of this appeal, Detective Radcliffe testified that when he "re-approached Houston on the driver side [of the Malibu], [Houston] opened the window and [Radcliffe] smelled a slight odor of a chemically smell that's consistent with [him] to an odor of cocaine."[12]

At Detective Radcliffe's request, Houston got out of the car, but his demeanor, according to Radcliffe, suggested that he was considering flight, which caused Radcliffe to instruct Houston to lean against the car and to keep his legs crossed. Houston's refusal to keep his legs crossed troubled Radcliffe, who then informed Houston, in an apparent effort to gain Houston's cooperation, that a police K9 unit was "literally right down the street"[13] and would be arriving momentarily.

Shortly after that, another Delaware State Police detective arrived on the scene, looked into the car through an open window, and noticed a plastic bag protruding from a "void"[14] below the console. According to Detective Radcliffe, such "voids" are commonly used to store drugs and contraband. In any event, after the detective observed the plastic bag, Houston "took off"[15] running. The police

---

[12] *Id*. at A72.
[13] *Id.* at A120.
[14] *Id.*
[15] *Id*. at A121.

6

gave chase on foot and, with the help of a taser, caught and subdued Houston, and placed him under arrest. Although the K9 unit arrived on the scene around the time that Houston fled, it does not appear as though the drug-sniffing dog ever sniffed the exterior of Houston's car.

Instead, the car was towed and, during an inventory search of Houston's car, the police removed the plastic bag from the void under the Malibu's console and in it found a large quantity of a substance suspected to be cocaine. The Division of Forensic Science eventually tested the substance, confirming that it was indeed cocaine weighing a little over 133 grams.

## II.

## A.

Houston moved to suppress the evidence seized from his car, namely the cocaine and an iPhone, on three grounds. First, Houston contended that the police lacked reasonable articulable suspicion to stop his vehicle. Next, he claimed that "[t]he authorities impermissibly extended the scope of the traffic stop when they informed Mr. Houston he would have to wait for a K-9 unit to arrive at the scene."[16] In furtherance of this claim, Houston noted that the State might rely on Detective Radcliffe's "alleged detection of a 'faint odor of cocaine,'"[17] and requested a

---

[16] *Id*. at A16.
[17] *Id*. at A22 (quoting the probable cause sheet attached to Corporal Saccomanno's search warrant application at A36).

*Daubert*[18] hearing "to ascertain the officer's training and experience in drug detection, as well as the ability for any human being to detect an odor of cocaine."[19] And last, he challenged the search warrant authorizing the search of Houston's cellphone because it did not establish a nexus between any crime and the phone. This last ground was mooted when the State agreed not to enter any evidence obtained from the cell phone during the prosecution's case-in-chief.

## B.

At the outset of the hearing on Houston's motion, at which the State's sole witness was Detective Radcliffe, the Superior Court deferred consideration of whether a *Daubert* hearing would be appropriate. But when Detective Radcliffe testified that, when he returned to Houston's vehicle as Corporal Saccomanno was "still doing the computer checks . . . [he] smelled a slight odor of a chemically smell that's consistent with [him] to an odor of cocaine,"[20] the court interrupted the testimony to hear from counsel regarding "the *Daubert* issue."[21]

---

[18] In *Daubert v. Merrell Dow Pharm., Inc.*, the United States Supreme Court announced the standards for determining the admissibility of expert-opinion testimony under Federal Rule of Evidence 702, which is almost identical to D.R.E. 702. 509 U.S. 579. In *M.G. Bancorporation, Inc. v. Le Beau,* this Court adopted *Daubert* and its progeny as "the correct interpretation of . . . [D.R.E.] 702." 737 A.2d at 522. Because we conclude that the application of *Daubert's* standards was not required under the circumstances presented here, a recitation of those standards is unnecessary.

[19] App. to Opening Br. at A22–23.

[20] *Id.* at A72.

[21] *Id.*

On both sides, counsel's argument focused on whether Detective Radcliffe's testimony was offered as an expert opinion under D.R.E. 702 subject to *Daubert*'s strictures—Houston's position—or, as the State contended, was admissible lay-opinion testimony under D.R.E. 701. Although the State made passing references to the fact that the issue in play during the suppression hearing was "probable cause to search a vehicle,"[22] neither side addressed the fact that Detective Radcliffe was not offering an opinion that what he smelled was in fact cocaine, but, rather, that the odor caused him to suspect the presence of cocaine.

Having heard from counsel and before ruling on the necessity of the *Daubert* inquiry, the court invited the State to question Detective Radcliffe about "his experience with smelling what is represented to be an odor of cocaine"[23] and the defense to follow up with cross-examination. During this background testimony, Radcliffe testified that his entire career focused on drug investigations, beginning with the New Jersey Street Crimes Unit in 2007. He then became a Delaware State Trooper in 2012 and joined the Governor's Task Force, which, among other things, investigates drug activity in Delaware. He is also a sworn task force officer in the Drug Enforcement Administration, working on drug investigations. Radcliffe holds

---

[22] *Id*. at A87.
[23] *Id.* at A89.

a bachelor's degree in Criminal Justice with a minor in Forensic Investigations from Stockton University. He could not remember if he had taken any chemistry courses.

Radcliffe testified that he had encountered the odor of cocaine in connection with "[h]undreds if not thousands of cocaine-related arrests."[24] When asked to describe the odor specifically, Radcliffe stated that "[the chemical odor] is very specific to . . . just like weed has a distinct smell, alcohol has a distinct smell, this chemical odor is very distinct to cocaine."[25] Including the odor of cocaine, Radcliffe is familiar with the smell of alcohol, marijuana, and PCP. Radcliffe agreed that his ability to perceive these odors, including cocaine, stems from his field experience. He explained,

> [f]ortunately, I have been doing this for many years, and with that experience brings experiences of other . . . car stops and seizures and . . . I have been involved in things such as upwards of 10-kilo grams or bricks of cocaine, and that same smell is the same as 100-plus grams of cocaine.[26]

During cross-examination, Radcliffe testified that, as a result of his experience and training as a police officer, he possessed thorough knowledge of the process cocaine undergoes, once in brick form, to produce either powder or crack cocaine.

---

[24] *Id.* at A92.
[25] *Id.*, *see id.* at A106 ("As familiar [as] I am with weed, I'm that familiar with the smell of cocaine.").
[26] *Id.* at A106–07.

But Radcliffe admitted that he was unfamiliar with the chemical makeup of cocaine, other drugs, or the agents used to cut cocaine.

After considering this *voir dire* examination, the court determined that Detective Radcliffe's testimony that he detected an odor that he associated with cocaine was not an expert opinion within the meaning of D.R.E. 702. This testimony was not, in the court's view, based on scientific, technical, or other specialized knowledge, which is a hallmark of expert-opinion testimony under D.R.E. 702. Instead, the court viewed the challenged testimony in the same light as the testimony of nonexperts, routinely admitted in the courts of this State, regarding the odor of alcohol and marijuana.[27] And because the testimony was rationally based on Detective Radcliffe's perception, the court ruled that it was admissible lay-opinion testimony and that, therefore, no *Daubert* hearing was required.

Detective Radcliffe's testimony resumed and, at its conclusion, the Superior Court denied Houston's motion to suppress. In short, the court found that the officers' observation of Houston's car crossing the white fog line numerous times supported a reasonable suspicion and justified the traffic stop. What followed, according to the court, "unfolded in an orderly," if "fast moving" pace.[28] And because Detective Radcliffe detected the odor of cocaine and Houston fled before

---

[27] *See, e.g.*, *Jenkins v. State*, 970 A.2d 154 (Del. 2009) (odor of marijuana); *Bease v. State*, 884 A.2d 495 (Del. 2005) (odor of alcohol).
[28] App. to Opening Br. at A182.

the police could issue a traffic citation, the court rejected Houston's claim that the police had impermissibly extended the traffic stop to conduct a separate investigation.

## C.

Upon the failure of Houston's motion to suppress, Houston informed the Superior Court that he wished to waive his right to a jury trial and to proceed with a stipulated bench trial. After the court confirmed by way of a colloquy with Houston that he understood his trial rights, the court held a bench trial as requested. The State entered the stipulation of facts into evidence and immediately rested, and the defense presented no evidence. The Superior Court then found Houston guilty of aggravated possession of cocaine (tier 5), misdemeanor resisting arrest, and a motor vehicle violation for failing to maintain a traffic lane. After that, the court sentenced Houston to two years incarceration followed by probation, and Houston appealed.

## D.

In this appeal, Houston raises a single issue: he claims that the Superior Court committed reversible error when it allowed Detective Radcliffe to testify during the suppression hearing that he detected an odor that he associated with cocaine emanating from Houston's vehicle. According to Houston, without that testimony,

the court would have been compelled to find that the police "lacked the reasonable suspicion necessary to extend the traffic stop beyond its original scope."[29]

III.

This Court reviews a trial court's decision to grant or deny a motion to suppress for abuse of discretion.[30]  Likewise, "[w]e review a trial judge's evidentiary rulings for abuse of discretion."[31]

IV.

A.

Police may stop and detain a motorist whom they reasonably suspect of criminal activity, which includes violation of our traffic laws.[32]  In the Superior Court, Houston argued that the police lacked a reasonable articulable suspicion that he had violated a motor vehicle law and that, in consequence, the stop of his vehicle was unlawful.  The court rejected that claim, crediting Detective Radcliffe's testimony that Houston's vehicle failed to remain in its lane "numerous times"[33] in violation of 21 *Del. C.* § 4122(1).[34]  Houston has not appealed that determination; instead, he asks us to conclude that the police, relying exclusively on Radcliffe's

---

[29] Opening Br. at 33.
[30] *Valentine v. State*, 207 A.2d 566, 570 (Del. 2019).
[31] *Jones v. State*, 940 A.2d 1, 9 (Del. 2007).
[32] *State v. Prouse*, 382 A.2d 1359, 1364 (Del. 1978), *aff'd*, 440 U.S. 648 (1979).
[33] App. to Opening Br. at A67; A180.
[34] 21 *Del. C.* § 4122(1) ("A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety.").

13

purported detection of a scent he associated with cocaine, impermissibly extended the scope of the traffic stop to undertake a second, unrelated investigation.

Houston's argument is predicated on the framework this Court adopted in *Caldwell v. State*[35] for reviewing a traffic stop that morphs into an investigation of other criminal activity not necessarily related to the traffic violation:

> The duration and execution of a traffic stop is necessarily limited by the initial purpose of the stop . . . . [A]ny investigation of the vehicle or its occupants beyond that required to complete the purpose of the traffic stop constitutes a separate seizure that must be supported by independent facts sufficient to justify the additional intrusion. Once the officer has issued a citation or warning and has run routine computer checks, the vehicle must be released unless the driver voluntarily consents to further questioning or the officer uncovers facts that independently warrant additional investigation. In short, an officer's observation of a traffic violation "does not confer the right to abandon or never begin to take action related to the traffic laws and, instead, to attempt to secure a waiver of Fourth Amendment rights."[36]

Houston argues that, but for the trial court's wrongful admission of Radcliffe's testimony about the "chemically" odor, there would have been no evidence independent of the traffic violation to justify extending the stop to search for drugs.

Houston's argument falls short of the mark in two important respects. First, the suppression hearing record does not support his factual contention that, before Houston fled the scene, the police engaged in investigative activity "beyond that

---

[35] 780 A.2d 1037 (Del. 2001).

[36] *Id.* at 1047–48 (footnotes omitted) (quoting *Charity v. State*, 753 A.2d 556, 572 (Md. Ct. Spec. App. 2000)).

14

required to complete the purpose of the traffic stop."[37] And even if we were to grant that the scope or duration of the stop was expanded upon Detective Radcliffe's detection of the odor he associates with cocaine, we find no constitutional fault with that.

B.

Although Houston alleges that Detective Radcliffe and Corporal Saccomanno impermissibly extended Houston's detention—initially justified as a traffic stop— to conduct a separate investigation for possible drug offenses, the Superior Court's factual findings suggest otherwise. Houston's claim rests largely on Detective Radcliffe's testimony that, as he stood with Houston, trying to forestall him from fleeing by directing him to cross his legs, he considered "stall[ing] for . . . a couple of seconds before the K9 got there . . . [because], if [detainees] hear a dog barking they are not going to run."[38] From this statement, Houston argues that Detective Radcliffe prolonged the stop in a manner that was condemned in *State v. Dillard*.[39]

In *Dillard*, however, the Superior Court found as a matter of fact that the officer who initiated the traffic stop "detoured from his task of issuing a ticket to make the call to [another officer] and wait for the K-9 Unit to arrive."[40] The court

---

[37] *Id.*
[38] App. to Opening Br. at A152.
[39] 2018 WL 1382394 (Del. Super. Ct. Mar. 16, 2018), *aff'd*, 207 A.3d 136, 2019 WL 1076869 (Del. Mar. 7, 2019) (TABLE).
[40] *Id.* at *6.

15

found that this activity "prolonged the traffic stop solely to investigate drug related criminal activity."[41] Thus, "the traffic stop ended and became a second detention,"[42] requiring independent reasonable suspicion. Notably, in response to the State's motion for reargument in *Dillard*, the Superior Court emphasized that its conclusion that there had been a measurable extension of the stop was the product of "its fact-specific analysis of [the] stop as to both duration *and* scope."[43]

Here, the Superior Court did not find that the officers detoured from the task of issuing a traffic citation or prolonged the stop in any measurable fashion before Houston's flight transformed the nature of the encounter. On the contrary, the court found that "the investigation seems to have unfolded in an orderly sequential pace,"[44] as part of a "fast moving continuum."[45] And though the court recognized that Detective Radcliffe was prepared to extend the stop—an extension the court found justifiable because of the officer's detection of the cocaine odor—that never happened because Houston fled. The court found further that, as of the moment of Houston's flight, Corporal Saccomanno had not yet completed his check of Houston's capias status or issued a traffic citation, noting that Houston fled during

---

[41] *Id.*

[42] *Id.*

[43] *State v. Dillard*, 2018 WL 2264414, at *2 (Del. Super. Ct. May 17, 2018) (Order) (emphasis in original).

[44] App. to Opening Br. at A182.

[45] *Id.*

the "necessary period of time"[46] it took Saccomanno to accomplish those tasks. Because these factual findings, which undermine Houston's contention that his detention was unlawful under *Caldwell*, are supported by the record, we conclude that the Superior Court did not abuse its discretion in denying Houston's motion to suppress.

C.

Although we have concluded that the Superior Court's factual findings support its ultimate decision separate and apart from its consideration of Detective Radcliffe's testimony about the "chemically" odor he detected, we nevertheless address Houston's claim that "[t]he Superior Court failed in its role as gatekeeper when it allowed Detective Radcliffe to testify that he purportedly detected the 'odor of cocaine,' despite the officer's testimony that such ability was solely based on his training and experience and therefore expert in nature."[47]  In the Superior Court, the State opposed Houston's request for a *Daubert* hearing, contending that the challenged testimony, though based on the officer's training and experience, was lay opinion testimony admissible under D.R.E. 701.  The court agreed with the State and allowed the testimony to stand, but only after allowing Houston the opportunity to

---

[46] *Id.* at A184.
[47] Opening Br. at 21.

17

conduct an extensive *voir dire* examination of Detective Radcliffe about his relevant training and experience.

Houston contends that the Superior Court's admission of Detective Radcliffe's testimony was contrary to this Court's decisions in the *Seward v. State*[48] and *Norman v. State*.[49] But only a superficial reading of those cases, coupled with a distortion of the actual testimony, would support Houston's argument.

In *Seward*, the defendant was convicted of delivery of cocaine based on, among other things, a police officer's surveillance of several hand-to-hand exchanges, between Seward and another man named Collins, of small white rocks that appeared to the officer to be crack cocaine. After one such exchange and as two other officers arrived on the scene to apprehend Collins, he reached in his pocket and put something in his mouth. After a struggle, "four or five small white chunky pebbles or rocks came out of Collins' mouth."[50] The pebbles were later tested by a forensic chemist, whose report was admitted at trial, and determined to contain crack cocaine.

During Seward's trial, the officer who had observed the exchanges between Seward and Collins was permitted to testify as a lay witness, over Seward's objection, that the substance exchanged between the two men looked like crack

---

[48] 723 A.2d 365 (Del. 1999).
[49] 968 A.2d 27 (Del. 2009).
[50] *Seward*, 723 A.2d at 368.

18

cocaine. This Court disagreed with the trial court's ruling, in part because the State conceded at oral argument that "the officer's testimony identifying the substance as crack cocaine was not within the common knowledge of a lay person and therefore the officer improperly testified as an expert."[51] We noted that

> [t]he trial court overruled Seward's objection and found that a police officer could testify what cocaine looked like because it was in the common knowledge of a police officer and did not rise to the level of expert testimony. Because, however, under the circumstances of this case, what the officers perceived could have been communicated accurately and fully by describing the substance, it was improper to allow the officers to express their opinion that the substance was crack cocaine.[52]

Because the trial court later instructed the jury to disregard the officer's testimony referring to the substance as crack cocaine, this Court determined that Seward was not substantially prejudiced by the error, and his conviction was affirmed.

In *Norman*, the prosecution sought to prove that two bags seized from Norman at the time of his arrest and taken from Norman's murder victim contained marijuana. Although Norman was charged with murder, he was also charged with possession with intent to deliver marijuana. Because of a delay in producing the

---

[51] *Id.* at 373 (footnote omitted). Because the Court's decision was based on D.R.E. 701(1)—that is, because it went beyond what the witness had perceived—it did not address whether identifying the substance as crack cocaine required special knowledge, skill, experience or training under D.R.E. 701(2). *Id.* at 373 n.26.
[52] *Id.* at 372–73 (footnote omitted).

forensic chemist's report identifying the seized substances as marijuana, the trial court excluded the report and the chemist's testimony. Lacking this evidence, the State offered testimony from three police officers who testified that the substances were marijuana or had the characteristics of marijuana.

On appeal, this Court held that "the officers should not have been allowed to identify the marijuana they seized from Norman,"[53] and commented on how the case resembled Seward:

> In *Seward v. State*, this Court held that police officers could not testify, as lay witnesses, that a substance was cocaine. The *Seward* court noted that, although the police officers were offered as lay witnesses who could identify cocaine based on their common knowledge, the officers actually were testifying as experts without being qualified. The same thing happened in this case.[54]

But the problem for Houston is that the same thing did not happen in this case. In both *Seward* and *Norman*, the challenged testimony was offered at trial to prove that the substances in questions were, in fact, controlled substances. By contrast, Detective Radcliffe's testimony was that he noticed an odor that he "associate[d] with cocaine,"[55] tying that association to his considerable experience with drug investigations:

> [T]he chemical smell that I described to be chemically is very distinct and I can only associate it with cocaine.

---

[53] *Norman*, 968 A.2d at 31.
[54] *Id.* (footnotes omitted).
[55] App. to Opening Br. at A103.

And over the years of my . . . experience of drug investigations that same smell, when I have smelled that chemically smell, has always produced a large bulk quantity of cocaine.[56]

And, critically, this observation was not offered during Houston's trial but during a hearing on Houston's motion to suppress where the reasonableness of Detective Radcliffe's suspicion, and not the actual nature of the substance whose odor was detected, was at issue. These distinctions, in our view, render *Seward* and *Norman* inapposite.[57]

## D.

Although the parties—and especially Houston—have focused their arguments on whether Detective Radcliffe's testimony about the smell he associated with cocaine was an expert opinion or a lay opinion, we do not see the resolution of Houston's argument as hinging on those classifications. Implicit in Houston's contention that the classification is relevant is his belief that when the Superior Court engaged in its totality-of-the-circumstances analysis to determine the reasonableness of Detective Radcliffe's suspicion that there was cocaine in Houston's car, it could

---

[56] *Id.*

[57] Houston also points us to a decision of Massachusetts trial court that rejected a police officer's suppression-hearing testimony about cocaine's distinct odor because it could not pass muster under *Daubert*. *Commonwealth v. Corniel*, 2005 WL 1668448, at *5 (Mass. Super. Ct. June 23, 2005). We note that *Corniel* has not since been cited by any other court; but more to the point, as explained below, we reject its fundamental premise that a police officer's suppression-hearing testimony, based on his law-enforcement experience, regarding the significance of a particular odor must meet *Daubert*'s standards.

21

only consider evidence that would be admissible in a criminal trial. This belief is inconsistent with search-and-seizure law.

The United States Supreme Court recognized long ago in *Brinegar v. United States* that there is a "difference between [w]hat is required to prove guilt in a criminal case and what is required to show probable cause for arrest or search."[58] The Court observed that, if the evidentiary standards applicable at trial were to be applied in proceedings whose purpose was to determine probable cause for an arrest or for a search and seizure, "few indeed would be the situations in which an officer, charged with protecting the public interest by enforcing the law, could take effective action toward that end."[59] Pointing to the obvious distinction between findings of guilt and probable cause determinations, the *Brinegar* majority wrote that:

> [i]n dealing with probable cause . . . as the very name implies, we deal with probabilities. These are not technical; they are factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved.[60]

Consistent with this distinction, in *United States v. Raddatz*, the Supreme Court stated more specifically that "[a]t a suppression hearing, the court may rely on

---

[58] *Brinegar v. United States*, 338 U.S. 160, 173 (1949).
[59] *Id.* at 174.
[60] *Id.* at 175.

hearsay and other evidence, even though that evidence would not be admissible at trial."[61]

That the courts of this State have adhered to a relaxed evidentiary standard when assessing the issues of probable cause and reasonable suspicion is evidenced by a plethora of decisions recognizing the propriety of considering informant hearsay—subject to reliability considerations—at suppression hearings.[62] Moreover, this rule is widely recognized among our sister state courts.[63] Thus, we do not hesitate to state explicitly what has resided implicitly in the practice of our trial courts and in our search-and-seizure jurisprudence: at a suppression hearing,

---

[61] *United States v. Raddatz*, 447 U.S. 667, 679 (1980).

[62] *See, e.g.*, *Valentine v. State*, 207 A.3d 566 (Del. 2019); *State v. Holden*, 60 A.3d 1110 (Del. 2013); *LeGrande v. State*, 947 A.2d 1103 (Del. 2008).

[63] *See State v. Zamzow*, 892 N.W.2d 637, 639 (Wis. 2017) (holding that the Confrontation Clause did not preclude the trial court's reliance on a deceased officer's recorded statement to make a reasonable suspicion determination at a suppression hearing); *State v. Bivins*, 140 A.3d 524, 531–32 (N.J. 2016) ("[H]earsay is permissible in suppression hearings . . . [which] may include evidence inadmissible in the trial on the merits.") (citations and quotations omitted)); *State v. Piper*, 855 N.W.2d 1, 9 (Neb. 2014) (concluding that the rules of evidence do not apply at hearings to determine preliminary questions of admissibility including suppression hearings); *State v. McRae*, 351 P.3d 797, 799 (Or. Ct. App. 2015) ("A hearing on a motion to suppress evidence in a criminal case is a hearing involving a preliminary question concerning evidence . . . and is not governed by the rules of evidence."); *State v. Woinarowicz*, 720 N.W.2d 635, 641 (N.D. 2006) ("The district court is not bound by the rules of evidence at a suppression hearing . . . ."); *Matoumba v. State*, 890 A.2d 288, 293 (Md. 2006) ("Because the common-law rules of evidence did not apply to suppression proceedings before adoption of the Maryland Rules of Evidence, it follows that, pursuant to Md. Rule 5-101 (b)(12) [excusing strict application in proceedings which, "prior to the adoption of the rules . . . , the court was traditionally not bound by the common-law rules of evidence"], the Rules now in effect are inapplicable to suppression hearings."). We note that Houston cites *State v. Schwetz*, 1986 WL 3671, at *3 (Ohio Ct. App. Mar. 14, 1986) for the proposition that it is inappropriate to relax the rules of evidence at suppression hearings. But we also note that a later opinion from the Ohio Court of Appeals was highly critical of *Schwetz*, listing "several reasons . . . [why] the *Schwetz* opinion enjoys very limited precedential value." *State v. Moss*, 1996 WL 130982, at *5 n.8 (Ohio Ct. App. Mar. 15, 1996).

where the reasonableness of a police officer's suspicion is at issue, "the rules of evidence normally applicable in criminal trials do not operate with full force."[64] The extent to which the rules of evidence should be relaxed in these circumstances is committed to the sound discretion of the trial court subject to the considerations we discuss below.

E.

"A determination of reasonable suspicion must be evaluated in the context of the totality of the circumstances as viewed through the eyes of a reasonable, trained police officer in the same or similar circumstances, combining objective facts with such an officer's subjective interpretation of those facts."[65] Indeed, it is now well settled that, when determining whether a police officer has the requisite level of suspicion to justify a detention or arrest, the expertise and experience of the officer are to be taken into account.[66] Hence, a trained and experienced police officer can develop a justifiable suspicion when an untrained lay person might not. This frequently comes into play when an officer relies upon his sense of smell in suspecting that an illegal substance is present.[67]

---

[64] *Matlock*, 415 U.S. at 172.

[65] *Jones v. State*, 745 A.2d 856, 861 (Del. 1999) (footnote omitted).

[66] 2 Wayne R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 3.2 (6th ed. 2020).

[67] *See, e.g.*, *Hall v. State*, 981 A.2d 1106, 1113 (Del. 2009) (holding that the police had a reasonable articulable suspicion to detain the defendant based on the officer's detection of "an overwhelming odor of PCP" coming from a car in which the defendant was sitting).

In *Johnson v. United States*, the United States Supreme Court rejected the defendant's contention that odors cannot be evidence sufficient to constitute probable cause for a search:

> If the presence of odors is testified to before a magistrate and he finds the affiant qualified to know the odor, and it is one sufficiently distinctive to identify a forbidden substance, this Court has never held such a basis insufficient to justify issuance of a search warrant. Indeed it might very well be found to be evidence of the most persuasive character.[68]

Whether an officer is "qualified to know the odor" is to be determined on a case-by-case basis,[69] not under the gatekeeping scrutiny mandated by *Daubert*, but just as any other observation by the officer would be considered under the totality-of-the circumstances test. As we noted in *State v. Murray*, "[w]hen an officer testifies about something he has learned . . . through his police experience, . . . a court cannot expect the testimony to be supported by a statistical analysis or a scientific study."[70] Rather, "commonsense judgments and inferences about human behavior"[71] should guide the court.

In this case, the Superior Court justified its consideration of Detective Radcliffe's testimony about the chemical odor by classifying the inference the detective drew from that odor as an admissible lay opinion under D.R.E. 701. But

---

[68] *Johnson v. United States*, 333 U.S. 10, 13 (1948).
[69] LaFave, *supra* note 66, § 3.6.
[70] *State v. Murray*, 213 A.2d 571, 580 (Del. 2019) (footnote omitted).
[71] *Id.* (*quoting Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)).

as mentioned above, we do not believe that the admissibility of the testimony turns on whether it falls neatly within D.R.E. 701's qualifications. Thus, we need not determine whether Detective Radcliffe's reliance on specialized training and experience transformed his suspicion that what he smelled as an indication—but not proof—of the presence of cocaine from an ordinary use of his sense of smell into the formation of an expert opinion. Instead, we review the trial judge's determination that the challenged testimony was sufficiently reliable and relevant to his determination of reasonable suspicion for an abuse of discretion. And given Detective Radcliffe's wealth of experience, which brought him into contact with cocaine on "[h]undreds if not thousands"[72] of occasions, and his ability to relate the chemical odor that he smelled when Houston opened his window to the presence of cocaine, we conclude that the Superior Court exercised its discretion soundly when it considered the challenged testimony.

## V.

Accordingly, the judgment of the Superior Court is affirmed.

---

[72] App. to Opening Br. at A92.